**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

━━━━━━━━━━━━━━━━━━━━━━━━━━━━

RASHAUN BLANFORD,

                              Plaintiff,

         v.

BANKS, et al.,                                    No. 9:21-CV-231
                                                  (TJM/CFH)

                              Defendants.

━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**APPEARANCES:**                    **OF COUNSEL:**

Rickner PLLC                        SARA WOLKENSDORFER, ESQ.
14 Wall Street, Suite 1603          STEPHANIE PANOUSIERIS, ESQ.
New York, New York 10005
Attorneys for plaintiff


Attorney General for the            BRITTANY M. HANER, ESQ.
State of New York                   Assistant Attorney General
The Capitol
Albany, New York 12224
Attorney for defendants

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

        Plaintiff Rashaun Blanford ("plaintiff"), who was at all relevant times in the

custody of the New York State Department of Corrections and Community Supervision

("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 against defendants

Correctional Officer ("C.O.") Shane Banks, C.O. James Johnson, Rehabilitation

Coordinator Brian Demeree, and Registered Nurse Sarah DeRocco (collectively,

---

[1] This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28
U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

"defendants") for violations of his Eighth Amendment rights and New York State law. See Dkt. No. 1 ("Compl."). Presently before the Court is defendants' motion for summary judgment. See Dkt. No. 100. Plaintiff responds pro se in opposition. See Dkt. No. 111. Defendants reply. See Dkt. No. 113.[2] For the following reasons, it is recommended that defendants' motion be granted.

## I. Legal Standard and Local Rules

### A. Summary Judgment Standard

"[T]he Court must construe the evidence in the light most favorable to the non-moving party, and may grant summary judgment only where 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" Hicks v. Craw, 405 F. Supp. 3d 374, 380 (N.D.N.Y. 2019) (citing Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999); quoting FED. R. CIV. P. 56(a)). "Material facts are those that 'might affect the outcome of the suit under the governing law.' An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986)).

The moving party has the burden of showing the absence of a genuine dispute of material fact by citing to "the record, including depositions, documents, electronically

---

[2] Without permission of the Court, plaintiff filed a sur-reply. See Dkt. No. 124. Defendants asked the Court to strike the sur-reply as plaintiff had not complied with Local Rule 7.1(a)(1). See Dkt. No. 126. The Court granted the request and struck the sur-reply. See Dkt. No. 127. Plaintiff subsequently retained counsel and asked the Court to allow counsel to "gather more documents to present on [his] behalf of the summary judgment[.]" Dkt. No. 132. The undersigned denied the request as the summary judgment motion was fully briefed. See Dkt. No. 133.

stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c).  A fact is material if it "might affect the outcome of the suit," as determined by the governing substantive law; a "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

If the moving party meets this burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  Anderson, 477 U.S. at 248 (citation omitted); see Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "When ruling on a summary judgment motion, the district court . . . must resolve all ambiguities and draw all reasonable inferences against the movant."  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  Still, the nonmoving party cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986) (citing Quarles v. Gen. Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985) (per curiam)); see also Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted) (alteration in original) ("[M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.").

Where a party seeks judgment against a pro se litigant, or a pro se litigant moves for summary judgment, the Court must afford the pro se litigant special solicitude.  See Treistman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006) (per curiam).  As the Second Circuit explained,

> [t]here are many cases in which we have said that a pro se
> litigant is entitled to "special solicitude," that a pro se

3

litigant's submissions must be construed "liberally," and that
such submissions must be read to raise the strongest
arguments that they "suggest[.]"  At the same time, our
cases have also indicated that we cannot read into *pro se*
submissions claims that are not "consistent" with the *pro se*
litigant's allegations, or arguments that the submissions
themselves do not "suggest," that we should not "excuse
frivolous or vexatious filings by *pro se* litigants," and that *pro
se* status "does not exempt a party from compliance with
relevant rules of procedural and substantive law[]" . . . .

Id. (citations omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191

(2d Cir. 2008) (citations and quotation marks omitted) ("On occasions too numerous to

count, we have reminded district courts that when [a] plaintiff proceeds *pro se*, . . . a

court is obligated to construe his pleadings liberally.").

### B.  Local Rule 56.1

Local Rule 56.1 requires the party moving for summary judgment to file "a

separate Statement of Material Facts.  The Statement of Material Facts shall set forth,

in numbered paragraphs, a short and concise statement of each material fact about

which the moving party contends there exists no genuine issue."  N.D.N.Y. L.R. 56.1(a).

The party opposing summary judgment must "file a separate Response to the

Statement of Material Facts."  N.D.N.Y. L.R. 56.1(b).  The response must "mirror the

movant's Statement of Material Facts by admitting and/or denying each of the movant's

assertions in a short and concise statement, in matching numbered paragraphs."  Id.

"The Court may deem admitted any properly supported facts set forth in the Statement

of Material Facts that the opposing party does not specifically controvert."  Id.

Here, defendants submitted a statement of material facts.  See generally Dkt. No.

100-1.  Plaintiff's response contains a page labeled "statement of facts," but it does not

admit or deny each of defendants' "assertions in a short and concise statement, in

4

matching numbered paragraphs."  N.D.N.Y. L.R. 56.1(b); see also Dkt. No. 111 at 15-16.[3]  As plaintiff has not properly responded, defendants' statements "that are supported by record evidence and are uncontroverted by nonconclusory allegations in [p]laintiff's verified complaint and verified opposition submissions will be accepted as true."  Clark v. Gardner, No. 9:17-CV-0366 (DNH/TWD), 2021 WL 1200328, at *13 (N.D.N.Y. Mar. 8, 2021), report and recommendation adopted, 2021 WL 1198199 (N.D.N.Y. Mar. 30, 2021); see also Tillman-Branch v. Grand Rehab & Nursing at Barnwell, No. 1:19-CV-540 (MAD/DJS), 2021 WL 1224051, at *2 (N.D.N.Y. Mar. 31, 2021).[4]


### III.  Factual Background

On February 2, 2021, while housed at Marcy Correctional Facility ("Marcy C.F."), plaintiff complained to DOCCS' staff that he had inserted two pen tips into his penis. See Dkt. No. 100-1 at 2, ¶ 8; see also Compl. at 2; Dkt. No. 100-3 at 26, lines 11-15. Non-party Sergeant ("Sgt.") Davis ordered plaintiff to be transferred from his cell to a contraband watch unit.  See Dkt. No. 100-1 at 2-3, ¶ 9; Dkt. No. 100-4 at 2, ¶ 6; Dkt. No. 100-9 at 1, ¶ 6.  C.O. Johnson, C.O. Banks, and Sgt. Davis went to plaintiff's cell to escort him.  See Dkt. No. 100-1 at 3, ¶ 9; Dkt. No. 100-4 at 2, ¶ 6; Dkt. No. 100-9 at 2, ¶ 6.  Sgt. Davis informed plaintiff that he was going to be escorted to the contraband watch unit and instructed him to put his hands through the cell door hatch to be

---

[3] Citations to the parties' filings are to the pagination generated by CM/ECF in the page's headers.
[4] All unpublished cases cited in his Report-Recommendation and Order have been provided to plaintiff, unless stated otherwise.

handcuffed.  See Dkt. No. 100-1 at 3, ¶ 10; Dkt. No. 100-4 at 2, ¶¶ 7-8; Dkt. No. 100-9 at 2, ¶¶ 7.  Plaintiff complied and C.O. Johnson placed mechanical restraints on plaintiff's wrists.  See Dkt. No. 100-1 at 3, ¶ 11; Dkt. No. 100-4 at 2, ¶ 8; Dkt. No. 100-9 at 2, ¶ 8.  Plaintiff removed his hands from the hatch, stepped into his cell, and C.O. Banks opened the cell door.  See Dkt. No. 100-1 at 3, ¶¶ 11-12; Dkt. No. 100-4 at 2, ¶ 8; Dkt. No. 100-9 at 2, ¶¶ 8-9.  C.O. Johnson and C.O. noticed a pillowcase containing plaintiff's property between plaintiff and the cell door.  See Dkt. No. 100-1 at 3, ¶ 12; Dkt. No. 100-4 at 2, ¶ 8; Dkt. No. 100-9 at 2, ¶ 9.  C.O. Johnson grabbed plaintiff's wrists, C.O. Banks knelt down to move the pillowcase, and plaintiff attempted to kick or use his feet to push C.O. Banks out of his cell.  See Dkt. No. 100-1 at 3, ¶¶ 12-13; Dkt. No. 100-4 at 2, ¶ 9; 7; 9; 11-16; Dkt. No. 100-9 at 2, ¶¶ 10-11; Dkt. No. 100-3 at 69, lines 9-17; 70, lines 18-20, 23-25; 71, lines 2-3.  C.O. Johnson and C.O. Banks pulled plaintiff to the ground, face first, and maintained pressure on his legs and back until other officers arrived.  See Dkt. No. 100-1 at 3-4, ¶ 14; Dkt. No. 100-4 at 2-3, ¶¶ 11-12; Dkt. No. 100-9 at 2-3, ¶¶ 13-14.  Sgt. Davis stood over the scene the entire time.  See Dkt. No. 100-4 at 3, ¶ 18; Dkt. No. 100-9 at 3, ¶ 20.  When responding officers arrived, plaintiff's ankles were placed in mechanical restraints, and he was escorted out of the unit.  See Dkt. No. 100-1 at 4, ¶ 15; Dkt. No. 100-4 at 3, ¶¶ 13-15; Dkt. No. 100-9 at 3, ¶¶ 15-17.

Sgt. Davis, C.O. Johnson, and C.O. Banks completed use of force reports stating that plaintiff attempted to kick Banks prior to the use of force.  See Dkt. No. 100-4 at 11-16.  Lieutenant ("Lt.") Pyke also submitted a use of force report which indicated that as plaintiff was being removed from his "cell he kicked rearward at staff but did not hit

them.  Staff used body holds to take [plaintiff] to the floor face first and held him there

until responding staff applied mechanical leg restraints."  Id. at 19-20.  Lt. Pyke did not

explain how he witnessed the use of force such as where he was standing in relation to

the incident.  See id. at 19-20.  Similarly, Captain ("Capt.") Kierpiec authored a use of

force report stating that plaintiff "attempted to kick at staff" and "Officers Banks +

Johnson used body holds and forced inmate Blanford to the ground."  Id. at 21-22.

Captain Kierpiec did not state where he was standing during the incident.  See id. at 21-

22.  C.O. Banks authored a misbehavior report against plaintiff which stated that plaintiff

"attempted to mule kick" him and he and another staff member forcibly took plaintiff to

the floor.  Id. at 36.

Plaintiff was taken to the infirmary and examined by Nurse DeRocco.  See Dkt.

No. 100-1 at 4, ¶ 16; Dkt. No. 100-8 at 2, ¶ 8.  Nurse DeRocco observed plaintiff in his

boxer shorts but was told by the correctional officers who conducted a strip frisk of

plaintiff that there was no visible trauma to plaintiff's penis.  See Dkt. No. 100-8 at 2, ¶¶

10-11.  Despite "view[ing p]laintiff in boxer shorts," Nurse DeRocco "did not observe any

health problems to [p]laintiff's genitalia."  Id. at 2, ¶ 11; see also Dkt. No. 100-1 at 4, ¶

17.  Nurse DeRocco consulted with non-party Nurse Practitioner ("NP") Corigliano, who

instructed Nurse DeRocco to monitor plaintiff but that the pen tips would likely pass on

their own.  See Dkt. No. 100-1 at 4, ¶¶ 17-18; Dkt. No. 100-8 at 2-3, ¶ 12; 7; 9.  Plaintiff

was evaluated by another nurse later that same day, and he did not appear to be in any

distress, he mentioned the pen tips in his penis, and the nurse stated that it was not a

medical emergency which warranted a trip to an outside hospital.  See Dkt. No. 100-8 at

3, ¶ 15; 26.

On February 3, 2021, plaintiff reported to Rehabilitation Coordinator Demeree that he had the two pen tips inside his penis, and he complained that he was not sent to an outside hospital.  See Dkt. No. 100-1 at 4, ¶¶ 20-21; Dkt. No. 100-7 at 2, ¶ 8.  Demeree observed plaintiff urinating on the floor and observed urine outside of his cell.  See Dkt. No. 100-1 at 5, ¶ 22; Dkt. No. 100-7 at 2, ¶ 8; 5.  Demeree reviewed the admission documents from plaintiff's admittance to the Residential Crisis Treatment Program and observed that the staff was already aware of plaintiff's complaint about the pen tips.  See Dkt. No. 100-1 at 5, ¶ 23; Dkt. No. 100-7 at 2-3, ¶¶ 10-11; 9.  Nurse DeRocco checked on plaintiff on February 3 and 4, 2021, and plaintiff did not appear in distress and made no complaints to her.  See Dkt. No. 100-1 at 5, ¶ 25; Dkt. No. 100-8 at 3, ¶ 16; 23-25.  Plaintiff complained to DeRocco on February 10, 2021, about the pen tips but stated that he was not having difficulty urinating.  See Dkt. No. 100-1 at 5, ¶ 26; Dkt. No. 100-8 at 3, ¶ 17; 18.  Plaintiff refused to come to the cell door and Nurse DeRocco "defer[red] to provider."  Dkt. No. 100-8 at 18; see also Dkt. No. 100-1 at 5, ¶ 26.  NP Corigliano examined plaintiff on February 12, 2021, and did not observe any irritation to plaintiff's penis, she was able to manipulate plaintiff's penis without concern, and he did not appear to be in any pain.  See Dkt. No. 100-1 at 5, ¶ 27; Dkt. No. 100-8 at 3-4, ¶ 18; 18.  NP Corigliano noted that there was no evidence of a foreign body in plaintiff's penis and an outside hospital visit was unnecessary.  See Dkt. No. 100-1 at 5, ¶ 27; Dkt. No. 100-8 at 3-4, ¶ 18; 18.

NP Corigliano ordered a urinalysis.  See Dkt. No. 100-1 at 5, ¶ 28; Dkt. No. 100-8 at 4, ¶ 18.  On February 16, 2021, plaintiff refused to provide a urine sample.  See Dkt. No. 100-1 at 5, ¶ 29; Dkt. No. 100-8 at 4, ¶ 19; 16-17.  Nurse DeRocco received a letter

on February 18, 2021, from plaintiff, alleging that he was being denied medical care. See Dkt. No. 100-1 at 5, ¶ 30; Dkt. No. 100-8 at 4, ¶ 20; 17.  A new urinalysis was ordered, and Nurse DeRocco performed a straight catheterization of plaintiff's urethra. See Dkt. No. 100-1 at 5-6, ¶ 30; Dkt. No. 100-8 at 4, ¶ 20; 15.  Plaintiff's urine appeared normal.  See Dkt. No. 100-1 at 6, ¶ 30; Dkt. No. 100-8 at 4, ¶ 20; 15.

Defendants assert in their statement of material facts that plaintiff testified that he received an X-ray from "another facility, which showed nothing inside his penis."  Dkt. No. 100-1 at 6, ¶ 31.  That is not an entirely accurate recitation of plaintiff's testimony. Plaintiff testified that while he was being transferred to Downstate Correctional Facility, he swallowed a lighter.  See Dkt. No. 100-3 at 33, lines 6-9.  At some unspecified point in time, plaintiff also "stuck . . . a staple inside of" himself.  Id. at 58, lines 15-16.  He testified that following an X-ray at Mount Vernon hospital, "they seen all that metal inside of me."  Id. at 33, lines 15-20.  He stated that the hospital asked him if he wanted surgery, and although he said yes, the hospital discharged him.  Id. at 33, lines 16-25. He also claimed that another X-ray was performed a few weeks before his deposition but "they did not see anything."  Id. at 63, lines 17-25; 64, lines 2-3.

Plaintiff filed a letter on February 8, 2021, to "Stephen Miller" which was received by the Office of Special Investigations ("OSI") on February 12, 2021.  See Dkt. No. 111 at 24.  Plaintiff complained that on February 2, 2021, he was thrown to the ground, that "C.O. Banks turned [him] around and touched [him] in the butt[,]" and "the nurse refused to send [him] to[] the hospital even after [he] was on contraband watch."  Id.  Plaintiff submitted a nearly identical letter to "Stephen Brandon" which was received by the

Assistance Commissioner for Administrative Services on February 12, 2021.[5]  See id. at

29.  Deputy Superintendent of Correctional Mental Health, D. Medbury, interviewed

plaintiff on February 25, 2021, "regarding his allegations of staff misconduct on 2/2/21."

Id. at 23.  Plaintiff told Medbury that "his written statement to OSI was complete and

accurate and had no further information."  Id.  Plaintiff was interviewed by Sgt. D.

Combs on February 26, 2021.  See id. at 25.  Plaintiff explained that "during a use of

force on February 2, 2021[,] Officer Bank[s'] hand touched [plaintiff's] buttocks.  Inmate

Blanford then stated that the only reason he said that it was sexual touching is because

he felt that excessive force was used for no reason."  Id.[6]  Plaintiff did not file any

grievances with the Inmate Grievance Resolution Committee ("IGRC") or the Central

Office Review Committee ("CORC") while housed at Marcy C.F.  See Dkt. No. 100-1 at

6, ¶ 31; Dkt. No. 100-10 at 5, ¶ 16; Dkt. No. 100-6 at 5, ¶ 16.  He was transferred to

Attica Correctional Facility on March 4, 2021, and did not file any grievances while

there.  See Dkt. No. 100-5 at 4-5, ¶¶ 14, 16; 8, 10.[7]


## IV.  Analysis

### A.  Exhaustion

---

[5] The receipt stamp is dated February 12, 2020.  See Dkt. No. 111 at 29.  However, defendants do not dispute the authenticity of the document, the letter is dated February 8, 2021, and it discusses the February 2, 2021, incident.  See id.

[6] Defendants do not challenge these specific documents that plaintiff submits with his response, or the contents related therein.  See generally Dkt. No. 113.

[7] As a result of the grievance search at Attica C.F., it appears that plaintiff wrote a grievance concerning "CO Harassment" on March 29, 2021.  Dkt. No. 100-5 at 10.  However, Brian Edwards, the Inmate Grievance Program Supervisor at Attica C.F. declared that plaintiff did not file any grievances related to this case.  See Dkt. No. 100-5 at 5, ¶ 16.

The Prison Litigation Reform Act ("PLRA") "prohibits a prisoner from bringing an action under 42 U.S.C. § 1983 'until such administrative remedies as are available are exhausted.'"  Garcia v. Heath, 74 F.4th 44, 46 (2d Cir. 2023) (quoting 42 U.S.C. § 1997e(a)).  "For prisoners confined by [DOCCS], the relevant administrative remedy is the Inmate Grievance Program ("IGP")."  Id. (citing 7 N.Y.C.R.R. § 701.5; Williams v. Priatno, 829 F.3d 118, 119 (2d Cir. 2016)).  There are three steps to the IGP: (1) "the inmate must submit a grievance to the clerk of the [IGRC] within twenty-one days of the alleged incident"; (2) "the inmate must appeal a denial of that grievance to the correctional facility's superintendent within seven days of the IGRC's response"; and (3) "the inmate must appeal a superintendent's denial to the [CORC] within seven days of such a denial."  Id. (citing 7 N.Y.C.R.R. § 701.5(a)(1), (c), (d)).

"[F]or complaints regarding sexual abuse or sexual harassment, DOCCS has established a different procedure."  Clark, 2021 WL 1200328, at *19.  "Revised in 2014 pursuant to the Prison Rape Elimination Act ("PREA"), Directive 4040 § 701.3(i) creates a relaxed exhaustion requirement for allegations concerning incidents of sexual assault."  Id. (citations omitted).  "Harassment grievances"—those that involve "employee misconduct meant to annoy, intimidate or harm an inmate," are subject to the "expedited procedure."  7 N.Y.C.R.R. §§ 701.2(e), 701.8.

> For purposes of the [PREA] Standards and the exhaustion requirement, any allegation concerning an incident of sexual abuse or sexual harassment shall be deemed exhausted if official documentation confirms that: an inmate who alleges being the victim of sexual abuse or sexual harassment reported the incident to facility staff; in writing to Central Office Staff; to any outside agency that the Department has identified as having agreed to receive and immediately forward inmate reports of sexual abuse and sexual harassment to agency officials under the PREA Standards; or to the Department's Office of the Inspector General.

7 N.Y.C.R.R. § 701.3(i) (internal citations omitted).  "When the grievance clerk identifies

a harassment grievance, the clerk must forward the grievance to the superintendent on

the same day that the grievance was filed."  William, 829 F.3d at120 (citing 7

N.Y.C.R.R. § 701.8(b)).  "If the grievance presents a bona fide harassment issue, then

the superintendent must initiate an investigation, render a decision on the grievance,

and inform the inmate of the decision within 25 days of receipt of the grievance."  Id.

(citing 7 N.Y.C.R.R. § 701.8(d), (f)).  "If the superintendent fails to respond within the

required 25 calendar day time limit the grievant may appeal his/her grievance to

CORC."  7 N.Y.C.R.R. § 701.8(g).  "Unless otherwise stipulated in this section, all

procedures, rights, and duties pertaining to the processing of any other grievance as set

forth in section 701.5 . . . shall be followed."  Id. § 701.8(i).

   "The Court is unaware of binding Second Circuit precedent regarding exhaustion

requirements and PREA grievances when sexual assaults are at issue alongside with

non-sexual misconduct."  Haywood v. Annucci, No. 18-CV-10913 (KMK), 2022 WL

4357648, at *8 (S.D.N.Y. Sept. 20, 2022).  District courts within the Second Circuit have

explained that because the relaxed PREA exhaustion standard applies to "any

allegation *concerning* an incident of sexual abuse or sexual harassment[,]" then "[n]on-

sexual acts done to enable, further, or magnify the sexual misconduct . . . 'concern[ ]' it,

thereby falling under this standard."  Haywood, 2022 WL 4357648, at *8 (quoting

Henderson v. Annucci, No. 14-CV-445, 2016 WL 3039687, at *3 (W.D.N.Y. Mar. 14,

2016)).  This is despite section 701.8(i) stating that "any other grievance" besides a

harassment grievance is subject to § 701.5.  7 N.Y.C.R.R. § 701.8(i).  District courts

have expanded application of the relaxed PREA standard only when the non-sexual act

is "intertwined" with the sexual act. <u>Sheffer v. Fleury</u>, No. 18-CV-1180 (LEK/DJS), 2019 WL 3891143, at *4 (N.D.N.Y. Aug. 19, 2019) (emphasis added) (concluding that a complaint that a correctional officer did not intervene to stop sexual abuse was covered by the PREA standards because "Directive 4040 specifically refers to an 'incident' of sexual abuse. That incident could include, not only the acts of sexual abuse by an inmate or a corrections officer, but also other events which are <u>necessarily intertwined</u> with such a claim, such as a physical assault during the course of the abuse; the failure of correctional staff to intervene to stop the rape; or acts or failures to act making a jail official legally accountable for the sexual abuse."), <u>report and recommendation adopted</u>, 2019 WL 4463672, at *6 (N.D.N.Y. Sept. 18, 2019); <u>see also</u> <u>Clark</u>, 2021 WL 1200328, at *27 (emphasis added) (concluding that the "[d]efendants have not sustained their burden of demonstrating that [the p]laintiff's sexual assault claims, <u>along with the</u> <u>alleged physical assaults</u>, were not properly exhausted under the relaxed procedures" where the plaintiff alleged that one defendant "'aggressively squeezed' [the p]laintiff's penis 'causing him pain' during an 'improper' pat frisk, and [another defendant] slammed [the p]laintiff's head into the wall."); <u>Johnson v. Brown</u>, No. 9:20-CV-622 (LEK/ATB), 2022 WL 7288498, at *10 (N.D.N.Y. May 12, 2022) (internal citation omitted) ("[The] plaintiff claims that the physical assault happened immediately before the sexual assault, and was part of the same incident even though it was not raised specifically with OSI.  While investigating the alleged sexual assault, the investigator would necessarily examine the facts surrounding the incident.  For purposes of exhaustion, this court finds that plaintiff gave defendants the opportunity to investigate the allegations.  The court will not separate the physical from the sexual assault

13

because plaintiff alleges that both were part of the same incident."), report and recommendation adopted, 2022 WL 4395995 (N.D.N.Y. Sept. 23, 2022).

However, where claims are unrelated to any sexual act, courts have not applied the relaxed PREA standards and instead required proof of exhaustion through the three-step IGP.  See Clark, 2021 WL 1200328, at *27 (concluding that a retaliation claim was unrelated to sexual assault claim); Cooper v. A. Annucci, No. 9:18-CV-762 (GTS/CFH), 2020 WL 8474802, at *10 (N.D.N.Y. Nov. 9, 2020) ("[A]lthough the [] retaliation claims are premised on alleged acts in retaliation for [the] plaintiff's filing his . . . PREA complaint . . . none of [the] retaliation claims involve allegations of sexual abuse or harassment or failure to prevent sexual abuse or harassment."), report and recommendation adopted sub nom. Cooper v. DeGraff, 2021 WL 235946 (N.D.N.Y. Jan. 25, 2021); Haywood, 2022 WL 4357648, at *9 (citation omitted) (concluding that due process claims and a claim for being pushed down the stairs required proper exhaustion under the three-step grievance procedures because "there is no suggestion that the push was taken in an effort to enable or further the sexual misconduct[]" and the due process claim was not "part and parcel" with the sexual act); Johnson, 2022 WL 7288498, at *8-11 (concluding that the plaintiff failed to exhaust medical indifference claims and due process claims despite reporting a physical and sexual assault to an OSI investigator).

"[A]side from the 'significant' textual qualifier that 'the remedies must indeed be 'available' to the prisoner,' there are 'no limits on an inmate's obligation to exhaust[.]'" Williams, 829 F.3d at 123 (quoting Ross v. Blake, 578 U.S. 632, 639 (2016)).  The Supreme Court has outlined "three kinds of circumstances in which an administrative

remedy, although officially on the books, is not capable of use to obtain relief." Ross,

578 U.S. at 643.  First, "an administrative procedure is unavailable when (despite what

regulations or guidance materials may promise) it operates as a simple dead end—with

officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id.

Second, "an administrative scheme might be so opaque that it becomes, practically

speaking, incapable of use.  In this situation, some mechanism exists to provide relief,

but no ordinary prisoner can discern or navigate it." Id. at 643-44.  Third, administrative

remedies may be unavailable "when prison administrators thwart inmates from taking

advantage of a grievance process through machination, misrepresentation, or

intimidation." Id. at 644.

Here, defendants do not take issue with plaintiff's Eighth Amendment sexual

abuse claim against Banks on exhaustion grounds.  See Dkt. No. 100-2 at 14, n.2; Dkt.

No. 113 at 8.  Rather, they argue that plaintiff's excessive force, failure to intervene, and

deliberate medical indifference claims are unexhausted and require dismissal because

plaintiff did not follow the three-step procedures set forth in 7 N.Y.C.R.R. § 701.5.  See

Dkt. No. 100-2 at 14-15; Dkt. No. 113 at 8-9.

Plaintiff alleges that while Johnson was throwing him to the ground, Banks came

to aid Johnson and sexually assaulted plaintiff by touching plaintiff's butt.  See Compl.

at 2.  Plaintiff's letter to OSI complained about the use of force, the sexual abuse, and

the medical indifference.  Dkt. No. 111 at 24.  Plaintiff sent a nearly identical letter which

was received by the Assistance Commissioner of Administrative Services.  See id. at

29.  A memorandum from Capt. Kierpiec to Sgt. Combs explains that during an

interview with plaintiff, plaintiff "stated that the only reason he said that it was sexual

15

touching is because he felt that excessive force was used for no reason." Dkt. No. 111 at 25.  An email to and from DOCCS' employees indicates that one employee did "not feel that it is a PREA" complaint. Id. at 22.[8]  In response, the Acting Assistant Deputy Chief Investigator explained that the "allegation is prea defined." Id.  Plaintiff argues that his letter to OSI and OSI's investigation are sufficient to exhaust his claims. See Dkt. No. 111 at 19.  He testified "they try to say I never filed a grievance, but that was a lie because Ms. Medbury forwards my grievance to O.S.I." Dkt. No. 100-3 at 82, lines 5-7.  He explained that "as far as this situation where my treatments got reported to O.S.I., I haven't heard nothing from them.  I been seen by O.S.I. about other complaints." Id. at 98, lines 24-25; 99, lines 2-3.  He restated, "[w]hen I wrote my grievance, that Ms. Medbury came to see me.  She said she forwarded my grievance to O.S.I." Id. at 102, lines 2-7.

Based on the foregoing, the undersigned concludes that the allegations surrounding the excessive force, failure to intervene, and sexual abuse claims are "intertwined" for purposes of exhaustion. See Haywood, 2022 WL 4357648, at *8; Sheffer, 2019 WL 3891143, at *4; Clark, 2021 WL 1200328, at *27; Johnson, 2022 WL 7288498, at *10.  The physical force can said to have facilitated the sexual act as the touching of plaintiff's butt would not have happened if he was not being forced to the ground. See Compl. at 2; see also Dkt. No. 100-4 at 4, ¶ 26.  Not only did the acts occur within seconds of each other, plaintiff alleged and testified that he thought he was grieving the issues by filing with OSI. See Dkt. No. 100-3 at 82, lines 5-7.  It also appears that DOCCS' employees were not certain as to whether the complaint fell

---

[8] The e-mail correspondence contains redactions such that the full names and titles of senders and recipients is unavailable. See Dkt. No. 111 at 22.

under the PREA.  See Dkt. No. 111 at 22.  This lends itself to concluding that plaintiff's excessive force and failure to intervene claims are so intertwined with the sexual abuse claim that they can fall under the relaxed PREA standards.  Applying those standards, defendants have not met their burden to show that no dispute of material fact exists as to whether plaintiff "reported the incident to facility staff" or "to any outside agency."  7 N.Y.C.R.R. § 701.3.  Rather, the evidence indicates that plaintiff complained to OSI and to Medbury about the sexual abuse, excessive force, and failure to intervene.  See Dkt. No. 111 at 23-26.  Thus, it is recommended that defendants' summary judgment motion be denied as to the exhaustion of these three claims.

The undersigned comes to a contrary conclusion as to plaintiff's medical indifference claims against DeRocco and Demeree.  "[T]here is no suggestion that [DeRocco's or Demeree's conduct] was taken in an effort to enable or further the sexual misconduct."  Haywood, 2022 WL 4357648, at *9.  As such, plaintiff's medical indifference claim is subject to the three-step grievance procedure outlined in § 701.5.

There is no dispute that plaintiff's medical indifference claim is unexhausted. Defendants provide declarations from Brian Edwards, the IGP Supervisor at Attica C.F., Rachael Seguin, the IGP Director, and Erin Pfendler, the IGP Supervisor at Marcy C.F. See Dkt. Nos. 100-5, 100-6, 110-10.  All three individuals affirmed that plaintiff did not file any grievances or appeals related to his claims against DeRocco and Demeree. See Dkt. No. 100-5 at 5, ¶ 16; Dkt. No. 100-6 at 5, ¶ 16, 7-8; Dkt. No. 100-10 at 5, ¶ 16. Plaintiff does not contend that he ever filed a grievance with IGRC.  See Dkt. No. 111 at 19.  Plaintiff testified that "[w]hen I file my grievances, I go to the Dep of Security, I go to the Superintendent, I go to even the medical, I go to – I write it to the counselor, I write

to I.G.R.C.,  I write it to O.S.I., I write it to – basically, everybody in the facility that I could write it to."  Dkt. No. 100-3 at 95, lines 19-24.  However, he did not testify that he ever filed a grievance with IGRC pertaining to the medical indifference claim.  The two complaints he submitted with his response were received by OSI and the Assistant Commissioner for Administrative Services.  See Dkt. No. 111 at 24, 29.  Nothing was ever submitted to or received by IGRC.

Plaintiff attaches a letter to his summary judgment response with the subject line "Appeal Letter to C.O.R.C." and it is dated April 12, 2021.  Dkt. No. 111 at 27.  As defendants point out, the letter was not notarized until October 14, 2022, one week before plaintiff filed his response with the Court.  See id.; see also Dkt. No. 113 at 9, n.1.  The letter states that plaintiff is "appealing the grievance decision that was made by Lt. Pike regarding the grievance interview with Correction officer Shane Banks on February 26, 2021[]"; and the "February 26, 2021[,] interview with Sergeant D. Combs in regard to the February 2, 2021[,] use of force incident that was excessive use of force."  Dkt. No. 111 at 27.  First, the letter says nothing about DeRocco's or Demeree's alleged medical indifference.  See id.  Second, the letter is of no consequence to exhaustion because even if it was filed with CORC, it only covers the third step of the exhaustion process.  See 7 N.Y.C.R.R. § 701.5.  Plaintiff did not allege in his complaint or response, and he has not presented any evidence that he filed a grievance with IGRC or filed an appeal to the superintendent concerning DeRocco's or Demeree's alleged medical indifference.  Plaintiff states in his response that he completed the first step by writing a grievance.  See Dkt. No. 111 at 19.  However, there is no evidence to support his filing of a grievance with IGRC and a complaint to OCI is not the same a grievance

18

to IGRC.  See 7 N.Y.C.R.R. §§ 701.5, 701.8.  He contends that "[t]he second step I took was that I got interviewed from all the high ups."  Dkt. No. 111 at 19.  However, DOCCS' investigation of a complaint does not demonstrate that plaintiff appealed a denial of a grievance to the Superintendent, which is the second step.  See 7 N.Y.C.R.R. § 701.5(c).  As plaintiff has presented no evidence that he completed the three-step grievance process concerning DeRocco's or Demeree's conduct, there is no dispute that plaintiff failed to exhaust his administrative remedies as to the medical indifference claims.

Finally, plaintiff does not allege, nor is there evidence in the record that the grievance process was unavailable to plaintiff in any of the ways outlined in Ross, 578 U.S. at 643.  See generally Compl.; Dkt. No. 111.  The IGP Supervisors at Marcy C.F. and Attica C.F. declare that the IGP was always available.  See Dkt. No. 100-5 at 4, ¶ 14; Dkt. No. 100-10 at 4, ¶ 14.  As plaintiff does not contend that administrative remedies were unavailable to him and there are no grievances in the record pertaining to medical indifference, it is recommended that plaintiff's medical indifference claims against DeRocco and Demeree be dismissed for failure to exhaust administrative remedies.  "[W]here a litigant has not exhausted required administrative remedies, and the time to do so has expired such that this deficiency cannot be cured, it is generally appropriate to dismiss the plaintiff's complaint with prejudice."  Harris v. Buskey, No. 9:21-CV-470 (LEK/CFH), 2022 WL 2663421, at *2 (N.D.N.Y. July 11, 2022); Porter v. Uhler, No. 9:17-CV-0047 (MAD/TWD), 2019 WL 2479000, at *16 (N.D.N.Y. Feb. 19, 2019) ("More than seventeen months has passed since [the p]laintiff was housed in the SHU.  Because [the p]laintiff's failure to exhaust is at this point an incurable grievance,

the Court recommends granting [the d]efendants summary judgment for failure to exhaust administrative remedies, and that the dismissal be with prejudice."), report and recommendation adopted, 2019 WL 1292226 (N.D.N.Y. Mar. 21, 2019), aff'd, 790 F. App'x 329 (2d Cir. 2020).   More than two years have passed since the time of the alleged medical indifference.   See Compl. at 2.   As the time has passed in which plaintiff could have exhausted his administrative remedies, it is recommended that the medical indifference claims be dismissed with prejudice.[9]

As to plaintiff's medical malpractice claim, defendants lump the claim in with the § 1983 excessive force, failure to intervene, and medical indifference claims; and argue that it should be dismissed for failure to exhaust administrative remedies.   See Dkt. No. 100-2 at 14.   Defendants say nothing of the difference between the medical malpractice claim being a state claim and the others being federal claims.   See id.   The PLRA states, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C.A. § 1997e(a).   Plaintiff's medical malpractice claims are brought under New York State law (which defendants acknowledge).   See Dkt. No. 100-2 at 24.   As § 1997e does not apply to state-law claims, it is recommended that defendants' motion be denied insofar as it seeks summary judgment for failure to exhaust the medical malpractice claim.   See Nunez v. Goord, 172 F. Supp. 2d 417, 430 (S.D.N.Y. 2001) ("As

---

[9] Because the undersigned concludes that plaintiff failed to exhaust his administrative remedies as to the medical indifference claims, it will not proceed to discuss the merits of those claims.   See Masas v. Conte, No. 9:13-CV-617 GLS/ATB, 2015 WL 1800482, at *2, n.2 (N.D.N.Y. Apr. 16, 2015); Engles v. Dougherty, No. 9:14-CV-1185 (TJM/ATB), 2017 WL 6466309, at *6 (N.D.N.Y. Aug. 22, 2017), report and recommendation adopted sub nom. Engles v. Souza, 2017 WL 6463074 (N.D.N.Y. Dec. 18, 2017).

[the plaintiff's] cause of action alleging negligence does not invoke § 1983, or any other federal law, it is not subject to § 1997e(a)'s exhaustion requirement."); Alston v. Daniels, No. 3:15-CV-669 (CSH), 2015 WL 7257896, at *10 (D. Conn. Nov. 17, 2015) ("However, the PLRA exhaustion requirement, and tolling of a *federal* civil rights claim during a prisoner's exhaustion, does not apply to state law claims."); Estruch v. Stich, No. 18-CV-6502 (CJS), 2019 WL 5865408, at *3 (W.D.N.Y. Nov. 8, 2019).

### B. Eighth Amendment Excessive Force and Failure to Intervene

"The Eighth Amendment's prohibition against cruel and unusual punishment encompasses the use of excessive force against an inmate, who must prove two components: (1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated 'contemporary standards of decency.'" Burroughs v. Mitchell, 325 F. Supp. 3d 249, 269 (N.D.N.Y. 2018) (quoting Blyden v. Mancusi, 186 F.3d 252, 262-63 (2d Cir. 1999)). "[W]hile 'a *de minimis* use of force will rarely suffice to state a constitutional claim,' the malicious use of force to cause harm constitutes an Eighth Amendment violation per se because in such an instance 'contemporary standards of decency are always violated.'" Id. (citations omitted). "The key inquiry into a claim of excessive force is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" Id. (quoting Hudson v. McMillian, 503 U.S. 1, 8 (1992)). Factors relevant to the determination of whether a defendant acted malicious include (1) "the extent of the injury and the mental state of the defendant, as well as the need for the application of force"; (2) "the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants"; and (3) "any efforts made by the defendants

to temper the severity of a forceful response." Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (citation omitted).

Plaintiff alleges that C.O. Johnson subjected him to excessive force when "Johnson for no reason picked [plaintiff] up by [his] handcuffs and threw [him] to the point where [his] body flew sideways and hit the ground." Compl. at 2. Plaintiff testified that Johnson "literally picked me up and threw me. My head hit the wall and then I hit the ground." Dkt. No. 100-3 at 27, lines 15-17. He emphasized that Johnson "just tossed me like a rag doll, literally like he toss me, and I flew towards the – I flew towards the wall, hitting the wall with my head and then just dropped to the ground. I literally flew across the company." Id. at 72, lines 18-22.

Plaintiff alleged in his complaint and response that Johnson took actions against plaintiff "for no reason" and that "at no point did" he "resist while [he] was in the air or act in a violent manner while the excessive use of force was going on." Compl. at 2; Dkt. No. 111 at 16. However, he testified that "[w]hen [Johnson] start trying to put – when he started to try to push me in my cell, there's a cell, the cell opened up. So he tried to push me in my cell so he could beat me up and other stuff, so I put my feet outside of the cell to block him from pushing in my cell." Dkt. No. 100-3 at 27, lines 9-14. He explained, "[w]hat happened is, when the cell door was open, he opened it and said that he tried to push me in my cell. I push my feet outside the cell because I'm in handcuffs." Id. at 69, lines 9-12. Plaintiff again stated, "I push my feet out of my cell, so he won't push me in my cell or do whatever he do to me in handcuffs for my own protection." Id. at 69, lines 15-17. He continued, "[s]o I put my feet outside of this . . . the cell stopping the C.O. from pushing me in my cell in handcuffs. That's what I did. . .

22

.  Because when I was in my handcuffs, my hands behind my back.  I felt the C.O. put a pressure on the handcuffs trying to push me in my cell."  Id. at 70, lines 18-20, 25; 71, lines 2-3.  He testified, "[w]ell, it's not placed my feet away the door to stop the C.O. from pushing me in a cell for no reason, all of a sudden, C.O. Johnson pick me up . . . by my handcuffs in midair and threw me sideways like a bow and arrow."  Id. at 71, lines 9-13.

Banks and Johnson declare that after plaintiff was handcuffed and his cell door was opened, Banks knelt to the ground to move a pillowcase filed with plaintiff's belongings out of the way.  See Dkt. No. 100-4 at 2, ¶ 9; Dkt. No. 100-9 at 2, ¶¶ 10.  They declare that plaintiff then kicked backwards toward Banks.  See Dkt. No. 100-4 at 2, ¶ 9; Dkt. No. 100-9 at 2, ¶ 11.  To gain control of plaintiff, Johnson "maintained control of [p]laintiff's wrists with [his] right hand and wrapped [his] left arm around [p]laintiff's upper torso.  While [he] restrained [p]laintiff's wrists and upper body, Officer Banks took control of [p]laintiff's lower body."  Dkt. No. 100-9 at 2, ¶ 13; Dkt. No. 100-4 at 2, ¶ 11.  The two officers forced plaintiff to ground, face first.  See Dkt. No. 100-4 at 2, ¶ 11; Dkt. No. 100-9 at 2, ¶ 13.  Use of force reports from C.O. Banks, C.O. Johnson, Sgt. Davis, Lt. Pyke, and Capt. Kierpiec indicate that plaintiff attempted to kick Banks immediately prior to the use of force.  See Dkt. No. 100-4 at 11, 13-16, 19-22.

There is no dispute that Johnson applied de minimis force in a good faith effort to maintain or restore discipline.  First, plaintiff's allegation in his complaint that Johnson's actions were "for no reason" and his testimony that "at no point did [he] resist," are belied by the record.  Compl. at 2; Dkt. No. 111 at 16.  Not only do the officers directly involved in the incident, as well as nonparty officers, contend that plaintiff attempted to

kick Banks, but the video evidence submitted by defendants corroborates that contention.  The video shows a camera angle facing plaintiff's cell door and reflects three guards walking down the hall to plaintiff's cell.  See Dkt. No. 100-11 at 4 (12:32:34-44).  Two other officers stood at the entry of the corridor on the opposite end of the hall from plaintiff's cell.  See id. (12:32:44).  Once the three officers arrived at plaintiff's cell door, one officer remained back from the cell.  See id. (12:32:50).  The other two offices approached the cell door and applied mechanical restraints to plaintiff's wrists.  See id. (12:32:50-59).  The cell door was opened.  See id. (12:33:03-09).  One officer started scraping something on the ground with his foot and bent down to the floor.  See id. (12:33:10-13).  Plaintiff jerked back toward the individual on the floor.  See id. (12:33:13-14).  Plaintiff was immediately pulled backwards and pulled to the ground, face first.  See id. (12:33:15-17).  The two officers applied pressure to plaintiff as he remains on the ground, and the third stood over the scene.  See id. (12:33:18-24).  Although the audio quality is exceptionally poor, one officer can be heard saying "Why the f*** would you push me back?"  Id. (12:33:20-21).  As one officer held plaintiff's leg behind his back and twisted across his back, plaintiff can be heard saying, "go ahead and break it.  Go ahead and f*** me up."  Id. (12:33:27-39).  Additional responding officers arrived, restrained plaintiff's ankles, and removed him from the hallway.  See id. (12:33:42-12:34:48).

"When appropriate, the court may rely on such video evidence to determine whether defendants are entitled to summary judgment."  Benitez v. Healy, No. 9:15-CV-1179 (GLS/ATB), 2017 WL 9673721, at *5 (N.D.N.Y. June 7, 2017) (collecting cases that used video evidence when determining a motion for summary judgment), report

and recommendation adopted, 2018 WL 1444218 (N.D.N.Y. Mar. 22, 2018).  Here, the
video supports defendants' contentions.  Plaintiff argues in his response that he did not
raise his foot in the video and that C.O. Banks did not move from his kneeling position
"for some time."  Dkt. No. 111 at 15.  The video shows precisely what plaintiff says it
does not.  The video shows plaintiff swiftly move back in Banks' direction, Banks
immediately flinches backwards, and Johnson pulls plaintiff away and onto the ground.
See Dkt. No. 100-11 at 4.  From the time of plaintiff's movement to Johnson's pull,
approximately one second lapsed.  See id.

 "Credibility assessments and the choice between conflicting versions of a story
are generally for a jury to resolve."  McLean v. Cottrell, No. 9:21-CV-1144 (TJM/ATB),
2023 WL 3793851, at *2 (N.D.N.Y. Apr. 17, 2023) (citing Rule v. Brine, Inc., 85 F.3d
1002, 1011 (2d Cir. 1996)), report and recommendation adopted, 2023 WL 3791244
(N.D.N.Y. June 2, 2023).  "However, the Second Circuit recognized an exception to this
rule in *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005)."  Id.  Jeffreys allows for
a court to grant summary judgment "where there is nothing in the record to support the
plaintiff's allegations, aside from his own contradictory and incomplete testimony, and
even after drawing all inferences in the light most favorable to the plaintiff, the court
determines that 'no reasonable person' could credit . . . his testimony."  Id. (citation and
quotation marks omitted).  "To apply the *Jeffreys* exception, the following three
requirements must be met: (1) the plaintiff must rely almost exclusively on his own
testimony, (2) the plaintiff's testimony must be 'contradictory or incomplete, and (3) the
plaintiff's testimony must be contradicted by evidence produced by the defense."  West

v. Harkness, No. 9:17-CV-0621 (GTS/DJS), 2022 WL 1555364, at *7 (N.D.N.Y. May 17, 2022) (citation and quotation marks omitted).

Plaintiff relies almost exclusively on his testimony.  See Dkt. No. 111 at 15-16. He does rely on the video, but the video evidence is contradictory to his testimony. Plaintiff testified that C.O. Johnson pulled him to the ground "all of a sudden" after pushing him "in a cell for no reason[.]"  Dkt. No. 100-3 at 71, lines 10-11.  In the video, plaintiff quickly moves his lower body backwards toward Banks as Banks is on the floor. See Dkt. No. 100-14 (12:33:13-14).  C.O. Johnson pulled plaintiff to the ground immediately thereafter.  See id.  Additionally, in his complaint and deposition, plaintiff contended that C.O. Johnson was alone in extracting him from his cell and C.O. Banks came up to the scene, later.  See Compl. at 2; Dkt. No. 100-3 at 71, lines 22-25; 72, lines 2-5.  The video clearly shows otherwise, and plaintiff corrects himself by acknowledging in his response that C.O. Banks was also extracting plaintiff.  See Dkt. No. 111 at 15.  Defendants have presented ample evidence that contradicts plaintiff's testimony.  They submit the video, Johnson's and Banks' declarations, and numerous use of force reports which indicate that plaintiff tried to kick C.O. Banks, C.O. Johnson used force in response, and Sgt. Davis was observed the incident the entire time.  See Dkt. No. 100-4 at 1-5, 7, 9, 11, 13, 15, 19; Dkt. No. 100-9 at 1-5.

No reasonable person could credit plaintiff's testimony where the video and every report from Johnson, Banks, and non-party DOCCS' employees indicate that C.O. Johnson was not alone, plaintiff jerked back towards C.O. Banks, and C.O. Johnson immediately pulled plaintiff away and onto the floor.

Further, Johnson's action does not amount to excessive force because it was not done wantonly or in bad faith, and it does not violate "contemporary standards of decency." Burroughs, 325 F. Supp. 3d at 269. Even if plaintiff was not attempting to "mule kick" C.O. Banks and was only attempting to push C.O. Banks or C.O. Johnson back from his cell, plaintiff did not complain of any injuries from the use of force, there is no evidence of malicious intent, and the Johnson was attempting to regain control of plaintiff. See Dkt. No. 100-3 at 70, lines 18-20.

In his deposition, plaintiff stated that his head hit the wall and he "had injury to [his] head. [He was hurting that whole – that whole day and then [he] had the pen tips stuck inside of [him.]" Dkt. No. 100-3 at 108, lines 22-25; 109, lines 4-6. Plaintiff did not allege in his complaint or response that he suffered a single injury from the use force incident. See generally Compl.; Dkt. No. 111. During his deposition, plaintiff admitted that he did not mention anything about his head to Nurse DeRocco when he was examined after the incident. See id. at 109, lines 14-22. The video also directly contradicts plaintiff's testimony. In the video, no part of plaintiff ever struck a wall. See Dkt. No. 100-11 at 4 (12:33:11-18). When he was put on the ground face first, it appears that the top of his head was pushing against the wall, but at no time did C.O. Johnson slam plaintiff's head into the wall. See id. (12:33:15-19).

"[T]he Second Circuit and district courts in the Circuit recognize the concept of de minimis injury and, when the injury resulting from alleged excessive force falls into that category, the excessive force claim is dismissed." Chaney v. City of Albany, No. 6:16-CV-1185 (NAM/TWD), 2019 WL 3857995, at *10 (N.D.N.Y. Aug. 16, 2019) (quoting Jackson v. City of New York, 939 F. Supp. 2d 219, 231 (E.D.N.Y. 2013)); Burroughs v.

27

Petrone, No. 9:15-CV-818 (DNH/ATB), 2018 WL 7291419, at *10 (N.D.N.Y. Dec. 27, 2018) (citation omitted) ("In cases where the defendants applied 'only a degree of roughness that is common in prison contexts,' and plaintiff has 'not claimed a lasting or even fleeting injury resulting from the defendant's conduct, courts in this circuit have routinely held that such conduct is insufficiently serious to support an Eighth Amendment claim.'"), report and recommendation adopted, 2019 WL 587090 (N.D.N.Y. Feb. 13, 2019).  "However, 'the absence of any significant injury to [plaintiff] does not end the [excessive force] inquiry, for our standards of decency are violated even in the absence of such injury if the defendant's use of force was malicious or sadistic.'" Chaney, 2019 WL 3857995, at *10 (second alteration in original) (quoting Wright, 554 F.3d at 270); see also Ellis v. Catalano, No. 16-CV-8452 (KMK), 2020 WL 1956963, at *12, *14 (S.D.N.Y. Apr. 23, 2020) (citations omitted) ("[A] plaintiff need not meet an arbitrary 'non-de minimis' injury threshold[.] . . .  [S]trict necessity is not the test.  Rather, 'the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'").

        Whether plaintiff attempted to "mule kick" C.O. Banks or push one of the officers out of his cell, it is clear that plaintiff was resisting what the officers were doing.  See Dkt. No. 100-1 at 3, ¶ 13; Dkt. No. 100-4 at 7, 9, 11, 13, 15, 19; Dkt. No. 100-3 at 27, lines 9-14; Dkt. No. 100-11 at 4 (12:33:13-14).  Johnson's de minimis force caused no injuries to plaintiff and the force ceased as soon as plaintiff was fully restrained.  See Compl. at 2; Dkt. No. 100-11 at 4 (12:33:13-48); Dkt. No. 100-8 at 7.  There is no evidence that Johnson's act of pulling plaintiff back and to the ground was done maliciously or sadistically.  Thus, there is no dispute of material fact sufficient to

withstand summary judgment.  See, e.g., Sanders v. Huges, No. 9:14-CV-0574 (DNH/ATB), 2015 WL 5655526, at *4 (N.D.N.Y. Sept. 24, 2015) ("By [the] plaintiff's own account, the defendant pushed him once.  While [the] plaintiff describes this push as violent, he did not suffer any physical injury from this contact."); Bermudez v. Waugh, No. 9:11-CV-0947 (MAD/DEP), 2013 WL 654401, at *5 (N.D.N.Y. Feb. 21, 2013) (explaining that the plaintiff alleged a correctional officer "charged [him] like a football player" "and with his weight he pushed his weight on my body, and I believe with his fist that he punched me in my chest area with his body weight at the same time[]"; and concluding that "[t]his conduct resulted in injuries that were described by [the p]laintiff as only a 'little red mark' or 'red bruise,' which was only 'a couple centimeters across.'  This de minimis use of force, which caused only slight bruising, is clearly insufficient to satisfy the objective prong of an excessive force claim."); Benitez, 2017 WL 9673721, at *7 ("The Video also contradicts almost all of [the] plaintiff's description of the level of force used by defendants.  While it is clear that the defendants used some measure of force against plaintiff, there is no evidence in the Video to support [the] plaintiff's assertion of malicious and sadistic action. . . .  ); Bradshaw v. City of New York, 855 F. App'x 6, 9 (2d Cir. 2021) (summary order) ("[The plaintiff] clearly failed to prove the culpability of [the defendants'] states of mind when they tackled and restrained him.  It is uncontroverted that [the plaintiff] refused to interlace his fingers behind his head when [the defendant] ordered him to do so, and the split-second decision to bring [the plaintiff] to the ground and subdue him to eliminate the security risk that the officers believed he posed was not excessive.  Thus, the district court properly granted summary judgment on [the plaintiff's] excessive force claim as it relates to the initial tackle.").  As Johnson's

use of force was not sadistic or malicious and did not result in any injuries to plaintiff, it is recommended that defendants' motion for summary judgment as to the excessive force claim be granted.

As to plaintiff's failure to intervene claim against Banks, where an underlying excessive force is dismissed, an accompanying failure to intervene claim requires dismissal.  See Jackson v. Vill. of Ilion, New York, No. 6:14-CV-563 (DNH), 2016 WL 126392, at *9 (N.D.N.Y. Jan. 11, 2016) ("[The plaintiff's] § 1983 claims for excessive force . . . will be dismissed.  Given this conclusion, [the] plaintiff's § 1983 claims asserting a failure to intervene to prevent the use of such force must be dismissed."); Lewis v. Mollette, 752 F. Supp. 2d 233, 244 (N.D.N.Y. 2010) ("In order to establish liability on the part of a defendant under a failure to intervene theory, a plaintiff must prove the use of excessive force by someone" else.); Martinaj v. Uhler, No. 9:18-CV-257 (BKS/DJS), 2023 WL 2984449, at *12 (N.D.N.Y. Mar. 13, 2023) ("[B]ecause [the plaintiff] did not plausibly allege facts supporting an excessive force claim, his failure to intervene claim necessarily fails as well.").  As the undersigned recommends granting summary judgment on the excessive force claim, so too does the undersigned recommend dismissing the failure to intervene claim.

### C.  Eighth Amendment Sexual Abuse

"[S]exual abuse by a corrections officer can give rise to an Eighth Amendment claim."  Crawford v. Cuomo, 796 F.3d 252, 257 (2d Cir. 2015) (citing Boddie v. Schnieder, 105 F.3d 857, 861 (2d Cir. 1997)).  "[A]n inmate need not allege that there was penetration, physical injury, or direct contact with uncovered genitalia."  Id.  "A corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the

officer's sexual desire or humiliate the inmate, violates the Eighth Amendment."  Id.
"Contact that does not occur during the course of 'a justifiable frisk or search of an
inmate's person' is subject to greater scrutiny than contact occurring during a frisk or
search."  Yunus v. Jones, No. 9:16-CV-1282 (GTS/ATB), 2019 WL 5196982, at *9
(N.D.N.Y. June 21, 2019) (citation omitted), report and recommendation adopted, 2019
WL 4010260 (N.D.N.Y. Aug. 26, 2019).

Plaintiff alleges that C.O. Banks "touched [his] butt."  Compl. at 2.  He testified
that C.O. Banks "sexually touched [his] butt[,]" it was a "split second" and was not a
grab, and it might have happened when C.O. Banks had plaintiff's leg in "a pretzel
position" or when the officer was pulling up plaintiff's pants.  Dkt. No. 100-3 at 28, lines
5-6; 79, lines 24-25; 80, lines 2,17-18, 21.  Plaintiff argues in his response that there
was no legitimate reason the defendants were involved in the incident and that C.O.
Banks humiliated plaintiff.  See Dkt. No. 111 at 74.

C.O. Banks and C.O. Johnson declare that any contact with plaintiff's butt was
incidental and "it was only so that [C.O. Banks] could gain control of [p]laintiff while he
was violently resisting and attempting to assault" C.O. Banks and C.O. Johnson.  Dkt.
No. 100-4 at 4, ¶ 26; see also Dkt. No. 100-9 at 4, ¶ 28.

It is undisputed that C.O. Banks was involved in the incident to escort plaintiff to
contraband watch, and that Banks had physical contact with plaintiff to subdue him on
the ground after he resisted the officers.  See Dkt. No. 100-4 at 2-4, ¶¶ 8-13, 26.  There
is no evidence, other than plaintiff's own statement, indicating that Banks had contact
with plaintiff's butt "with the intent to . . . humiliate the inmate[.]"  Crawford, 796 F.3d at
257.  Rather, the single incident was incidental to C.O. Banks' duties as a correctional

31

officer.  See Delee v. Hannigan, 729 F. App'x 25, 30 (2d Cir. 2018) (summary order) (citation omitted) ("[W]here the plaintiff 'has adduced no evidence from which we can reasonably infer that [the defendant] had intended to search him with intent to arouse or gratify [defendant's] sexual desires,' there are no genuine issues of material fact for the jury to explore."); Cook v. Suterland, No. 19-CV-2780 (NSR), 2021 WL 429949, at *5 (S.D.N.Y. Feb. 6, 2021) ("[The plaintiff's] claim against [the o]fficer [] also fails because the alleged lingering pat on [the p]laintiff's buttocks occurred during a pat down that [the plaintiff] admits was part of a legitimate cell search after a fight broke out.  [A] lingering touch does not, without more, amount to a constitutional violation."); Washington v. Piper, No. 18-CV-7783 (NSR), 2019 WL 6343516, at *4-5 (S.D.N.Y. Nov. 26, 2019) ("[The p]laintiff's allegation of minimal contact by [the d]efendant [] is an example of a single incident which is not 'sufficiently severe or serious,' and does not objectively violate the Constitution.  [The p]laintiff's bare allegations of a poke to the groin while he was in inside of his housing unit fail to assert sufficient facts.").  As there are no facts upon which a jury could rely to conclude that C.O. Banks' conduct went beyond that which was necessary for penological purposes, it is recommended that summary judgment be granted as to the sexual abuse claim.

### D.  New York State Medical Malpractice

"To establish a claim for medical malpractice under New York law, a plaintiff must prove (1) that the defendant breached the relevant standard of care, and (2) that the breach proximately caused the plaintiff's injuries."  Sawka v. United States, No. 1:19-CV-1156 (MAD/TWD), 2022 WL 2869455, at *3 (N.D.N.Y. July 21, 2022) (citations omitted).  "In order to show that the defendant has not exercised ordinary and reasonable care, the plaintiff ordinarily must show what the accepted standards of

practice were and that the defendant deviated from those standards or failed to apply

whatever superior knowledge he had for the plaintiff's benefit." Sitts v. United States,

811 F.2d 736, 739 (2d Cir. 1987) (citation omitted).  "And to show proximate cause, the

plaintiff must show that the defendant's breach of duty of care is 'a substantial cause of

the events which produced the injury.'" Sawka, 2022 WL 2869455, at *3 (quoting Mann

v. United States, 300 F. Supp. 3d 411, 420 (N.D.N.Y. 2018)).  "New York law requires

that, except as to matters within the ordinary experience and knowledge of laymen, . . .

expert medical opinion evidence is required' to make out both elements." Id. (quotation

marks omitted) (quoting Milano v. Freed, 64 F.3d 91, 95 (2d Cir. 1995)).

Plaintiff argues that his medical malpractice claim should not be dismissed

because he "presented expert testimony in the form of affidavit exhibit A that the care

rendered by defendants departed from the standards of medical practices.  Plaintiff will

submit a physician's affidavit of merit attesting to a departure from accepted practice

and containing the attesting doctor's opinion . . . ." Dkt. No. 111 at 89.  "Exhibit A"

contains two documents: (1) a letter from Deputy Commissioner/Chief Medical Officer

Carol A. Moores explaining that his concerns about the Marcy C.F. Health Services staff

were investigated, he was X-rayed on two separate occasions, and that he was

examined by his provider; and encouraging him to speak with a registered nurse if he

was still experiencing difficulty urinating; and (2) Nurse DeRocco's examination report

from after the use of force incident.  See id. at 91-92.  Plaintiff does not provide any

evidence concerning the appropriate standard of care, let alone expert evidence.  This

is fatal to his medical malpractice claim.  See Barnes v. State, 133 N.Y.S.3d 921, 921-

22 (App. Div. 2020) ("[R]egardless of whether a claim is characterized as sounding in

negligence or medical malpractice, where medical issues are not within the ordinary experience and knowledge of lay persons, expert medical opinion is required to establish that [the] defendant's alleged negligence or deviation from an accepted standard of care caused or contributed to the claimant's injuries.  Inasmuch as [the] claimant failed to present any such expert evidence, the Court of Claims properly dismissed the entire claim."); Shields v. United States, 446 F. App'x 325, 326 (2d Cir. 2011) (summary order) (citations omitted) ("[The plaintiff] concedes that under New York law, which governs this case, 'it is incumbent upon the plaintiff to present expert testimony in support of the allegations to establish a prima facie case of [medical] malpractice.'  As [the plaintiff] failed to adduce any such evidence, the district court properly concluded that the government was entitled to summary judgment on his malpractice claim."); McQueen v. United States, No. 9:19-CV-998 (TJM/CFH), 2021 WL 3849457, at *10 (N.D.N.Y. June 29, 2021) (granting summary judgment on a medical malpractice claim because "aside from [the] plaintiff's own conclusory assertions, he proffers no evidence—much less expert evidence—suggesting that [the defendant's] decision to treat his acne with Sulfamethoxazole/Trimeth constituted a departure from accepted standards of medical care[.]"), report and recommendation adopted, 2021 WL 3848494 (N.D.N.Y. Aug. 27, 2021); Ross v. United States, No. 1:15-CV-1094 (MAD/CFH), 2018 WL 1870470, at *4 (N.D.N.Y. Apr. 17, 2018) ("The Court recognizes that [the p]laintiff is appearing pro se, but this does not excuse her failure to procure expert medical testimony to support her [medical malpractice claim].").

Defendants submitted Nurse DeRocco's affidavit.  See Dkt. No. 100-8.  Nurse DeRocco declares that she used her medical judgment and consulted with another

provider, NP Corigliano, when making medical decisions.  See Dkt. No. 100-8 at 2-4 ¶¶ 10-13, 21-22.  Nurse DeRocco continued to monitor plaintiff for the days following the incident.  See id. at 3, ¶¶ 14, 16; 19-26.  She notified NP Corigliano when plaintiff complained of pain, plaintiff's penis was examined, he provided a urine sample for a urinalysis, and a straight catheterization was performed.  See id. at 3-4, ¶¶ 17-20.  Plaintiff has not presented any evidence to rebut Nurse DeRocco's declaration concerning her course of conduct.  As plaintiff has not presented expert evidence to raise a dispute of material fact as to whether Nurse DeRocco's actions constitute medical malpractice, it is recommended that the medical malpractice claim against Nurse DeRocco be dismissed.

## V.  Conclusion

**WHEREFORE**, based on the foregoing, it is hereby:

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 100) be **GRANTED**; and it is further

**RECOMMENDED**, that plaintiff's complaint (Dkt. No. 1) be **DISMISSED IN ITS ENTIRETY WITH PREJUDICE**; and it is

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.

Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated:  August 28, 2023
       Albany, New York

Christian F. Hummel
U.S. Magistrate Judge